## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| CORPORATE RESOURCE SERVICES, INC., et al.,[1] | Case No.: 15-11546 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF
## CHAPTER 11 PETITIONS AND RELATED MOTIONS

Pursuant to 28 U.S.C. § 1746, J. Scott Victor declares as follows:

1.      I am at least 21 years of age and am competent to give this declaration. I have knowledge of the matters to which I hereinafter depose, except where otherwise stated. I have also reviewed the records, press releases and other relevant documents of the above-captioned debtors and debtors-in-possession (the "Debtors") and have spoken with certain directors, officers and/or employees of the Debtors, as necessary, and where I have relied upon such information do verily believe such information to be true.

2.      I am the chief restructuring officer of Corporate Resource Services, Inc., et al ("CRS"), a Delaware corporation.  I am authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are (1) Corporate Resource Services, Inc. (1965); (2) Accountabilities, Inc. (5619); (3) Corporate Resource Development Inc. (1966); (4) Diamond Staffing Services, Inc. (7952); (5) Insurance Overload Services, Inc. (9798); (6) Integrated Consulting Services, Inc. (2385); (7) The CRS Group, Inc. (1458); and (8) TS Staffing Services, Inc. (8647).  The Debtors' principal offices are located at 160 Broadway, 13th Floor, New York, New York, 10038.

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors will continue to operate its business and manage its property as debtors-in-possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of (i) the Debtors' voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), and (ii) the Debtors' "first-day" motions (collectively, the "First Day Motions"). The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of these chapter 11 cases on the businesses. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the continued survival of the Debtors and the success of these chapter 11 cases (the "Chapter 11 Cases").

## I. INTRODUCTION

5.      CRS was a provider of employment and human resource solutions for corporations.  Although CRS has a corporate headquarters in New York, it provides its services nationwide.

6.      As described in greater detail below, beginning in February 2015, Debtors have engaged in an orderly wind down of operations.  The Debtors have reduced their staff significantly, have aggressively continued to pursue receivables and have liquidated a majority of their business assets.  The Debtors do not currently have the liquidity needed to meet ongoing payment and operating obligations on a long term basis.

7.      The Debtors' transition into wind down mode began when it was discovered, in late January 2015, that the professional employer organization (or PEO) that the Debtors used,

TS Employment, Inc. ("TSE") had failed to remit a very substantial amount to taxing authorities, mostly related to employee withholding taxes, in an amount then believed to be in the range of $80 million.  At that time, the Debtors were in engaged in a process to refinance their existing lender, Wells Fargo Bank, N.A. ("Wells Fargo") with a new lender, and the Debtors were likely within several weeks of closing that refinancing.  Due to the foregoing discovery, however, the new lender was unwilling to refinance the Wells Fargo debt, and Wells Fargo refused to continue funding the Debtors' ordinary course operations.

8.      Wells Fargo did agree to fund a wind down of the Debtors' operations, which would include the continuing employment and payment, for a limited period, of both the Debtors' own employees and approximately 30,000 temporary employees deployed by the Debtors, and the assurance that those employees' wages and related going-forward benefit and tax amounts, as well as other payments to unsecured creditors, would be paid.  As conditions to that continued funding, Wells Fargo required that TSE file a chapter 11 bankruptcy case and that both the Debtors and TSE retain chief restructuring officers (CROs).  The Debtors, facing the prospect of unpaid wages for tens of thousands of employees and other effects of an uncontrolled shutdown and liquidation, acceded to Wells Fargo's demands.  Days later, TSE hired its CRO and subsequently filed a chapter 11 bankruptcy petition in New York, which case is still pending.  Subsequent to the filing, James S. Feltman was appointed the chapter 11 trustee in that case, replacing TSE's CRO.

9.      With the supervision of Wells Fargo, on February 4, 2015, the Debtors retained their own CRO, Robert Riiska of Focus Management Group USA, Inc.  On July 22, 2015, Mr. Riiska resigned as CRO and the Board of Directors approved the placement of myself as CRO.  At the same time, the Board of Directors approved the filing of these bankruptcy cases.

10.     From February through the Petition Date, Wells Fargo has maintained a tight control of the Debtors' cash and accounts receivable assets, which flow through the Debtors' accounts maintained at Wells Fargo, while it continued to provide funding for the Debtors' wind down.  In so doing, Wells Fargo limited the use of the Debtors' borrowings from Wells Fargo, as well as the cash generated from the Debtors' business operations, collection of accounts receivable, and asset sales, to fund only the wind down of the Debtors, which, from Wells Fargo's perspective, was principally for the recovery of Wells Fargo's loans.

11.     As a result of the wind down imposed by Wells Fargo, the principal and interest obligations on the loans, which were approximately $60,000,000 as of January 27, 2015, have been satisfied in full.  Nonetheless, Wells Fargo has continued to control Debtors cash in order to fund potential overdrafts on the Debtors' accounts, alleged fees and expenses that Wells Fargo claims are reimbursable by the Debtors, and potential indemnity claims that it might have sometime in the future.  The Debtors do not agree with Wells Fargo nor do they consent to the maintenance of the reserve or any fees, costs or other expenses that Wells Fargo have unilaterally deducted from the Debtors' accounts.  The Debtors reserve all rights with respect to the actions of Wells Fargo for the pre-petition period.

12.     TSE also maintains that it is owed substantial sums from the Debtors in the range of $60 million.  At a minimum, the Debtors dispute this amount, and, based on the fact, among others, that the actions of TSE in failing to at least pay tens of millions of dollars in taxes essentially brought an end to the Debtors' businesses and destroyed a company with approximately a billion dollars in sales in 2014, the Debtors believe they may have counterclaims and defenses that could eviscerate and/or exceed any claims of TSE against the Debtors.  Although there are some historic common board members and some common

ownership interests among the Debtors and TSE (including the majority stockholder of CRS being the 100% indirect stockholder of TSE), CRS is a publicly-traded company (or was, prior to NASDAQ delisting), while TSE is a private company, and the corporate entities are deeply adverse to one another.

13.    The Debtors also maintain a substantial book of accounts receivable that it is continuing to collect.  The collection program has been very successful to date and the Debtors expect to recover substantial funds from this program.  At the same time, the Debtors with my assistance as CRO, expect to locate appropriate sale partners for their receivable portfolio.  The face amount of the Debtors' remaining accounts receivable is approximately $30,000,000.

14.    Finally, the Debtors are in the midst of litigation pending in several jurisdictions, certain of which one or more of the Debtors are the plaintiff, and some where they are defendant. The automatic stay afforded by the bankruptcy filing will allow the Debtors the opportunity to keep that litigation at bay while the Debtors pursue a bankruptcy plan.

15.    Ultimately, the Chapter 11 Cases will allow the Debtors to streamline their operations while providing the necessary time and process to complete the current restructuring and/or sale process for the benefit of stakeholders. Absent the protections of the Bankruptcy Code, a shutdown of the Debtors' operations is inevitable, to the detriment of the Debtors' employees, customers, suppliers and creditors.

16.    The board of directors of each of the Debtors has authorized the filing of these Chapter 11 Cases.

## II. BACKGROUND OF THE DEBTORS

### A. Business Operations

17.    CRS was incorporated in Delaware in December 2009.  Historically, CRS maintained its headquarters in New York.  The Debtors lease their headquarters and do not own any real property.  CRS is a holding company for its subsidiaries.  The subsidiaries were at one point operating temporary staffing service entities and were incorporated as follows (the "Operating Subsidiaries"):

| Name: | State | Date |
| --- | --- | --- |
| Accountabilities, Inc. | Delaware | June 9, 2005 |
| Corporate Resource Development Inc. | Delaware | March 23, 2010 |
| Diamond Staffing Services, Inc. | Delaware | October 7, 2010 |
| Insurance Overload Services Inc. | Delaware | July 22, 2010 |
| Integrated Consulting Services Inc. | Delaware | October 18, 2010 |
| The CRS Group, Inc. | Delaware | April 18, 2012 |
| TS Staffing Services, Inc. | TX | October 21, 2011 |

18. On a consolidated basis, Revenue from operations through June 30, 2015 totaled approximately $145 million. On a consolidated basis and through June 30, 2015, the Debtors generated a loss of $16 million.

19.    As of June 30, 2015, accounts payable and accrued expenses totaled $49,000,000 million.

### B. Corporate Structure

20.    The chart attached hereto as Exhibit A reflects the ownership structure of the Debtors.  CRS is a publicly traded entity on the OTC and was previously traded on the

NASDAQ.  The remaining Debtors are wholly owned subsidiaries and are not publicly traded entities.

## C. Employees

21.    As of the Petition Date, the Debtors employ approximately sixteen (16) full time employees and nine (9) part time employees.  The Debtors' average current monthly payroll obligation is approximately $200,000. The Debtors' Employees are not affiliated with a union and are not parties to a defined pension plan.

22.    The Debtors' employees and contractors are skilled and possesses great familiarity with the Debtors' operations. I believe that the Debtors' Employees are critical to continue operations and the Debtors' ability to preserve, maximize, and ultimately realize the value of its business as a going concern.

## D. Pre-Petition Indebtedness and Capital Structure

23.    Beginning on or about 2009, and continuing thereafter through a series of additional agreements and amendments, the Operating Subsidiaries entered into those certain Account Purchase Agreements and related documents with Wells Fargo, which provided accounts receivable financing to the Operating Subsidiaries and under which the Operating Subsidiaries granted security interests in what eventually became substantially all of the Debtors' assets (the "Wells Fargo Loans").  Wells Fargo is the only creditor with a lien on the Debtors' cash (aside from professional retainers, incidental deposits, and similar arrangements).

24.    More specifically, the accounts receivable financing provided that Wells Fargo would purchase specific accounts receivable generated from the Operating Subsidiaries, and would receive a security interest on substantially all of the Operating Subsidiaries' assets.  The primary assets of the Debtors are (a) cash held by Wells Fargo, in the amount of approximately

7

$3,000,000 (the "Excess Cash"); (b) accounts receivable generated by the Operating Subsidiaries, in the face amount of approximately $30,000,000; and (c) claims against third parties, which may include claims against Wells Fargo (collectively, the "Primary Assets," having an unknown but potentially substantial value (the "Primary Asset Value").

25.     As of January 27, 2015, the Debtors owed Wells Fargo $60,000,000. As noted above, when it was discovered that TSE failed to remit employee withholding tax amounts related to the Debtors' business was discovered on January 27, 2015, Wells Fargo decided not to fund the ongoing operating of the Debtors' business other than in a wind-down mode. At that time, the Debtors began aggressively to pay down the Wells Fargo Loans from the collection of accounts receivable and from the proceeds of liquidation of lines of business, with the intention of creating the maximum value for all creditors, including both Wells Fargo as secured lender and unsecured creditors. Since that time, Wells Fargo has received sufficient funds from collection of the receivables of the Debtors and liquidation of other assets to reduce this balance and subsequent advances to zero as of the Petition Date. Wells Fargo has also collected additional funds in excess of the amount of the loan, resulting in the Excess Cash, which is property of the Debtors' estates and which should, together with the other Primary Assets and any other value in the Debtors' estates, be made available to the Debtors' unsecured creditors.

26.     Despite the Debtors paying what they believed was all amounts due under the Wells Fargo Loans and demanding a payoff letter and lien release from Wells Fargo, Wells Fargo has continued to assert additional amounts are due under the Wells Fargo Loans. Wells Fargo maintains that it retains certain indemnity rights and other contingent claims against the

Debtors and rights to the reimbursement of fees and expenses,[2] and therefore has refused to release its liens or release the Excess Cash, despite the Debtors payment of all principal and interest amounts, and very substantial fees and expenses, under the Wells Fargo Loans, and despite the fact that any contingent claims that Wells Fargo may have are vastly oversecured by the Primary Asset Value and any other value of their collateral. Meanwhile, Wells Fargo has continued to exert strict control over the Debtors' accounts, all of which are maintained at Wells Fargo, and to require Wells Fargo consent for each and every expenditure of the Debtors.

**E. Cash Management System**

27.    As of the Petition Date and in the ordinary course of their businesses, the Debtors maintain a cash management and disbursement system (the "Cash Management System"). The Cash Management System is an integrated, centralized system that enables the Debtors to collect, transfer, and disburse funds as needed and to accurately record all such transactions as they are made. Importantly, the Debtors' Cash Management system provides a substantially unified system that allows for an integrated method of accounting for revenues and expenses.

28.    As of the Petition Date, the Debtors maintain fifteen (15) bank accounts with Wells Fargo plus a primary distribution account with Wells Fargo.

29.    In order to lessen the disruption caused by these bankruptcy filings and maximize the value of its estate in these Chapter 11 Cases, I believe it is vital for the Debtors that they maintains their current system of managing cash.

---

[2]    Accrued expenses for which Wells Fargo is entitled to be reimbursed, but has not yet been reimbursed, are included in the Budget attached to the Interim Cash Collateral Order. Therefore, upon implementation of that Budget, Wells Fargo will have been paid all amounts due and reimbursed for all accrued expenses, leaving only hypothetical, contingent claims as the only obligations for which the Debtors could be liable to Wells Fargo, making the oversecured nature of Wells Fargo's hypothetical, contingent claims, in light of the Primary Asset Value, even more remarkable.

## III. EVENTS LEADING TO THE DEBTORS' CHAPTER 11 CASES

30.     As of December 31, 2014, CRS was one of the largest employment staffing companies in the U.S., providing employment and human resource solutions for corporations with annual sales of about one billion dollars.  Although CRS has its corporate headquarters at 160 Broadway, 13th Floor, New York, NY 10038, it provided services nationwide.  About 90% of CRS shares are owned by Mr. Robert Cassera and the balance are traded OTC.

31.     CRS financed its daily operations through Wells Fargo, to which its operating subsidiaries assigned its accounts receivables under a series of account purchase agreements.  It utilized the services of TS Employment, Inc. (TSE"), a company wholly owned by Mr. Cassera, as its professional employer organization, which processed all payroll and revenue billing for CRS.

32.     In or about June of 2014, Wells Fargo advised CRS to search for another lender and CRS engaged the services of a broker.  Negotiations with potential lenders failed in November of 2014 and again in January of 2015.

33.     As referenced above, in or about January of 2015, Wells Fargo learned of the TSE non-payment, then believed to be in the approximate amount of eighty million dollars,[3] and declared CRS to be in default under terms of its account purchase agreements.  Without Wells Fargo purchasing the accounts receivable on a go forward basis, CRS had no choice but to begin a liquidation process as approved by Wells Fargo. Wells Fargo elected to strictly limit its financing of CRS business activities, primarily to pay the costs of pursuing accounts receivable collections.

---

[3]     Claims filed by taxing authorities against TSE have face amounts that are in the aggregate a multiple of this amount.  The claim of the IRS alone has a face amount of approximately $400 million, but includes claims that appear to be based on income tax as well as employee withholding tax, and that add interest and penalties.

34.    The Debtors also maintain a substantial book of accounts receivable that they are continuing to collect.  The collection program has been very successful to date and the Debtors expect to recover substantial funds from this program.  At the same time, the Debtors, with the help of myself, expect to locate appropriate sale partners for their receivables portfolio.

35.    Finally, the Debtors are in the midst of litigation pending in several jurisdictions, in which certain of the Debtors are plaintiff, and some in which they are defendant.  The automatic stay afforded by the bankruptcy filing will allow the Debtors the opportunity to keep that litigation at bay while it pursues a plan.

36.    Ultimately, the Chapter 11 Cases will allow the Debtors to stabilize and streamline their operations while providing the necessary time to process and complete the current restructuring and/or sale process for the benefit of stakeholders. Absent the protections of the Bankruptcy Code, a shutdown of the Debtors' operations is inevitable, to the detriment of the Debtors' employees, customers, suppliers and creditors.

37.    The board of directors of each of the Debtors has authorized the filing of these Chapter 11 Cases.

## IV. THE DEBTORS' FIRST DAY MOTIONS[4]

38.    I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to effectively operate, and (c) the negative effects if the Debtors do not obtain the requested relief. My opinions are based upon my first-hand experience, my review of the relevant documents, my discussions with

---

[4] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the appropriate First Day Motion.

other members of the Debtors' management team, various constituencies of the Debtors and the

Debtors' advisors.

39.     I reviewed each of the First Day Motions and participated in the preparation

thereof. I believe, to the best of my knowledge, that the facts set forth in the voluntary petitions

and the First Day Motions are true and correct. This representation is based upon information

and belief and thorough my review of various materials and information, as well as my

experience and knowledge of the Debtors' operations and financial condition. Based upon the

foregoing, if called to testify, I could and would testify competently to the facts set forth in each

of the First Day Motions.

40.     The relief sought in the First Day Motions will minimize the adverse impact of

these cases on the Debtors' customers, Employees and suppliers, while allowing the Debtors to

maximize value for the creditors. I believe that the relief sought in the First Day Motions is

necessary to enable the Debtors to operate effectively as Debtors-In-Possession.

41.     It is critical to the viability of the Debtors' restructuring that the going concern

value be preserved and that disruption of the business operations be kept to a minimum.

42.     Some of the First Day Motions request authority to pay or otherwise honor certain

prepetition claims. I am advised that Rule 6003 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") provides that "except to the extent relief is necessary to avoid

immediate and irreparable harm," the court shall not consider motions to pay prepetition claims

during the first 20 days after the filing of a petition. As set forth in more detail below and in the

First Day Motions, I believe that the Debtors' requests for authority to pay prepetition claims are

narrowly tailored to those circumstances where the failure to pay such claims would bring

immediate and irreparable harm, or which would otherwise be entitled to administrative priority under the Bankruptcy Code.

## A. Cash Management/Bank Accounts Motion

43.     By this motion, the Debtors seek entry of an order authorizing the continued use of their existing Cash Management System and existing bank accounts and business forms. The Debtors also request a waiver of certain of the operating guidelines established by the U.S. Trustee that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery. The Debtors further requests the entry of an Order authorizing continued use of their prepetition deposit practices.

44.     As discussed above, the Debtors maintain a Cash Management System in the ordinary course of their operations. In order to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in the Chapter 11 Cases, it is vital to the Debtors that they maintain their current system of managing cash.

45.     The Cash Management System maintained by the Debtors has been designed to (i) provide an efficient method of collecting, transferring and disbursing funds; (ii) establish procedures and controls necessary to account funds in an accurate manner; and (iii) facilitate timely satisfaction of the Debtors' financial obligations. The Debtors maintain current and accurate accounting records of daily cash transactions, and I believe that preservation of the Debtors' Cash Management System will prevent undue disruption and cost to the Debtors' business operations, while protecting the Debtors' cash for the benefit of the estates.

46.     The Debtors also seek a waiver of the U.S. Trustee's requirement that their existing accounts be closed and that new post-petition bank accounts be opened. If enforced in

this case, such requirements would cause significant disruption and cost in the Debtors' business and would impair the Debtors' chapter 11 efforts.

47.     The Debtors also request that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks existing immediately before the Petition Date without reference to the Debtors' status as debtor-in-possession. If the Debtors are required to change its correspondence, business forms and checks, it would be forced to choose standard forms rather than the current forms with which those that do business with the Debtors are familiar. Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization, as well as with customers and vendors. Equally important is ensuring that costs are contained.

48.     I believe it is critical that the Debtors are granted the relief requested by this motion to lessen the disruption caused by these Chapter 11 Cases. For these reasons and as more thoroughly provided in the motion, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**B. Motion to Pay Employee Wages, Benefits and Withholdings**

49.     By this motion, the Debtors seek: (a) authority to, in its sole discretion, pay the prepetition wages, salaries, and benefits of its Employees, (b) authority to, in its sole discretion, continue employee benefit programs in the ordinary course of business, and (c) an order authorizing and directing all banks and payroll services to honor prepetition checks for payment of prepetition wage, salary and benefit obligations.

50.     As described more fully in the motion, the Debtors has costs and obligations in respect of their Employees relating to the period prior to the Petition Date. By this motion, the Debtors request authority to pay any wages and salaries accrued, but unpaid prepetition, on a post-petition basis, in an amount not to exceed $46,000.

51.     The Debtors are required by law to withhold certain amounts from their Employees' wages and to remit the same to the appropriate taxing authorities.   These withholding amounts relate to, for the Debtors' Employees, federal, state, and local income taxes, as well as social security and Medicare taxes. The Debtors may also be required to withhold amounts from the Employees' wages for such items as court ordered child support payments, other attachments to wages and government mandated savings plans. In addition, the Debtors are required to make contributions of their own funds to the taxing authorities in the form of matching payments for their Employees on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for, among other things, state and federal unemployment insurance. I believe that the current practice of directing such funds to the appropriate parties is in the ordinary course of business and appropriate on a postpetition basis.

52.     The Debtors also seek authorization directing all banks and payroll services to receive, process, honor and pay any and all checks related to wages and benefits, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable Accounts to cover such payments.

53.     There can be no doubt that the Debtors' Employees are a substantial component to the uninterrupted operation of the Debtors' business during these Chapter 11 Cases. For these reasons and the others described more thoroughly in the motion, I believe the relief sought in this

motion is necessary to avoid immediate and irreparable harm, including but not limited to the loss of Employees and the potential shutdown of operations.

**C. Utilities Motion**

54.     In connection with the operation of its business and management of their property, the Debtors obtains power, telephone, internet, water, trash and other similar utility services (collectively the "Utility Services") from several utility companies (collectively, the "Utility Companies"). By this motion and pursuant to sections 105(a) and 366 of the Bankruptcy Code, the Debtors request, among other things, entry of interim and final orders (i) determining that the Utility Companies have been provided with adequate assurance of future payment within the meaning of section 366 of the Bankruptcy Code, (ii) approving the Debtors' proposed offer of adequate assurance and procedures governing Utility Companies' requests, if any, for additional or different adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, and (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion.

55.     During the course of the Chapter 11 Cases, the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. The Debtors have budgeted availability that is more than sufficient to pay all postpetition obligations for Utility Services. With respect to adequate assurance of payment for postpetition services, the Debtors proposes to reserve an amount equal to two (2) weeks of expected Utility Service usage (calculated as the average weekly usage in the 12 months prior to the Petition Date) for each Utility Company (the "Adequate Assurance Deposits").

56.     Uninterrupted Utility Services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of the Debtors' Chapter 11 Cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of its estate could be severely and irreparably harmed. It is therefore critical that Utility Services continue on an uninterrupted basis. For these reasons and as more thoroughly provided in the motion, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**D. Cash Collateral Motion**

57.     In the Cash Collateral Motion, the Debtors seek the entry of an order permitting the Debtors to use their cash in accordance with the budget that the Debtors attach as Exhibit A to the Cash Collateral Motion.

58.     While the Debtors maintain that the secured claims of Wells Fargo have been completely satisfied, the Cash Collateral Motion nonetheless allows for replacement liens to the extent that they were valid, perfected and existed.  In addition, the Debtors account for a modest reserve to the extent that Wells Fargo ultimately demonstrates that it is entitled to additional funds.

59.     The relief sought in the Cash Collateral Motion is necessary to the operation of the Debtors during the pendency of these cases.

60.     I have read the Cash Collateral Motion and firmly believe that the relief sought in the motion is necessary and in the best interest of the Debtors' estates.

**E. Joint Administration Motion**

61.     In the Joint Administration Motion, the Debtors seek the joint administration of these chapter 11 cases for procedural purposes only.   The Debtors are "affiliates" as defined in the Bankruptcy Code.  In addition, the Debtors' operations are closely integrated and there will be numerous motions, applications and other pleadings filed in these chapter 11 cases that will affect all of the Debtors.  Accordingly, joint administration in the present case will allow for the efficient administration of these chapter 11 cases.

62.     Joint administration of these chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and to permit parties to combine notices to creditors and other parties in interest of the Debtors' respective estates.  Moreover, allowing joint administration will significantly reduce the volume of pleadings that otherwise would be filed with the Clerk of Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays.  The relief requested by the Joint Administration Motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

63.     The proposed joint administration order will also save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to: (a) use a single caption on the numerous documents that will be served and filed herein; and (b) file the papers in one case rather than in multiple cases.  Finally joint administration will protect parties in interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be appraised of the various matters before the Court in these cases.

64.     I have read the Joint Administration Motion and believe that the relief requested in the motion is in the best interests of the Debtors and the Debtors' estates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Date:    July 23, 2015

J. Scott Victor
Chief Restructuring Officer

# EXHIBIT A

CRS Legal Entities

| COMPANY NAME | Last Four Digits of Federal ID Number | FEDERAL ID# | STATE OF INC. | Start (Date Incorporated or Acquired) | Nature of the Business | Parent |
|---|---|---|---|---|---|---|
| CORPORATE RESOURCE SERVICES, INC. | 1965 | 80-0551965 | Delaware | 12/15/2009 | Primarily a Holding Company | |
| ACCOUNTABILITIES, INC. | 5619 | 11-3255619 | Delaware | 6/9/2005 | Temporary Staffing | 100% Sub of CRS |
| CORPORATE RESOURCE DEVELOPMENT INC. | 1966 | 27-2201966 | Delaware | 3/23/2010 | Temporary Staffing | 100% Sub of CRS |
| DIAMOND STAFFING SERVICES, INC. | 7952 | 27-3637952 | Delaware | 10/7/2010 | Temporary Staffing | 100% Sub of CRS |
| INSURANCE OVERLOAD SERVICES, INC. | 9798 | 27-3209798 | Delaware | 7/22/2010 | Temporary Staffing | 100% Sub of CRS |
| INTEGRATED CONSULTING SERVICES, INC. | 2385 | 36-4682385 | Delaware | 10/18/2010 | Temporary Staffing | 100% Sub of CRS |
| THE CRS GROUP, INC. | 1458 | 90-0821458 | Delaware | 4/18/2012 | Temporary Staffing | 100% Sub of CRS |
| TS STAFFING SERVICES, INC. | 8647 | 45-3668647 | TX | 10/21/2011 | Temporary Staffing | 100% Sub of CRS |